IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

**BRENDA K. MACKEY**                                                                                       **PLAINTIFF**

**V.**                                            **CASE NO. 3:15-CV-3004**

**LIBERTY LIFE ASSURANCE COMPANY**
**OF BOSTON**                                                                                              **DEFENDANT**

## MEMORANDUM OPINION AND ORDER

This case comes before the Court following Liberty Life Assurance Company of Boston's ("Liberty Life") decision to terminate Brenda Mackey's long-term disability benefits. The dispute arises under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et. seq.*, which gives participants in an employee welfare benefit plan a cause of action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Ms. Mackey filed her Complaint (Doc. 1) on January 16, 2015, asking the Court to order Liberty Life to pay her the benefits to which she argues she is entitled. Liberty Life filed its Answer (Doc. 6) on February 20, 2015, generally denying the allegations against it. Ms. Mackey filed her "ERISA Brief" (Doc. 13) on May 13, 2015, and Liberty Life filed its "ERISA Brief" (Doc. 14) on June 12, 2015. The case now being ripe for decision, the Court **REVERSES** Liberty Life's decision and **REMANDS** Ms. Mackey's claim for further evaluation correcting the issues identified by the Court herein.

1

## I.  BACKGROUND

Brenda Mackey was employed as a registered nurse ("RN") by Baxter Regional Medical Center ("BRMC") for approximately 20 years. During the relevant portion of this time, she was enrolled in BRMC's employee welfare benefit plan, which was underwritten and administered by Liberty Life. Following a bout with chronic knee pain, Ms. Mackey had a total knee arthroplasty on August 1, 2011. The medical experts who have treated Ms. Mackey or reviewed her files are all in material agreement that the surgery resulted in postoperative femoral nervepalsy with resulting quadriceps dysfunction. In layman's terms, this means that Ms. Mackey suffered some nerve damage during her knee surgery, and that the nerve damage has caused her quadriceps muscle to become significantly weakened.

Ms. Mackey applied for long term disability ("LTD") benefits pursuant to BRMC's employee welfare benefit plan. Liberty Life approved her request, and began paying her LTD benefits on January 28, 2012. Per the benefit plan, a "Covered Person" is "Disabled" if she "is unable to perform the Material and Substantial Duties of [her] *Own Occupation*." (Doc. 12-1, p. 6) (emphasis added). After 24 months, however, a "Covered Person" continues to be "Disabled" only if she "is unable to perform, with reasonable continuity, the Material and Substantial Duties of *Any Occupation*." *Id.* (emphasis added). The benefit plan defines "Any Occupation" as "any occupation that the Covered Person is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity." *Id.* at 5. And, it defines "Material and Substantial Duties" as "responsibilities that are normally required to perform the Covered Person's Own Occupation, or any other occupation, and cannot be reasonably eliminated or modified."

*Id.* at 8. Both parties agree that Ms. Mackey met the benefit plan's definition of disabled during the initial 24-month period—the "Own Occupation" period. After this period ended on January 27, 2014, however, Liberty Life determined that she did not meet the "Any Occupation" definition of disabled, and terminated her benefits accordingly.

In so doing, Liberty Life relied primarily on medical information from: Ms. Mackey's treating physician, Dr. Knox; BRMC's Rehab Services Department; Twin Lakes Neurology; and Drs. Boswell, Pennington, and Johnson, all of whom were hired by Liberty Life to review Ms. Mackey's medical records. Liberty Life also relied upon a report titled "Transferable Skills Analysis / Vocational Review," drafted by Ellen Levine, a Vocational Case Manager employed by Liberty Life. Based on these sources of information, Liberty Life sent Ms. Mackey a letter on December 16, 2013, informing her that they were terminating her LTD benefits effective January 27, 2014. Ms. Mackey requested a review of this decision. As part of the review, her complete file, including additional records received with her appeal, was reviewed by Liberty Life's Managed Disability Services unit. The additional records included a vocational analysis performed by Tanya Owens, Ph.D., and submitted by Ms. Mackey. On July 17, 2014, Liberty Life sent a letter to Ms. Mackey's attorney, Rick Spencer, informing him that it was affirming its decision to terminate Ms. Mackey's benefits. Ms. Mackey timely appealed that decision to this Court.

## II.    LEGAL STANDARD

Generally, once a plaintiff has exhausted her administrative remedies, the Court's function is to conduct a review of the record that was before the administrator of the plan when the claim was denied. *Farfalla v. Mutual of Omaha Ins. Co.*, 324 F.3d

971, 974-75 (8th Cir. 2003); *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). A denial of benefits claim under ERISA is reviewed for an abuse of discretion when "a plan gives the administrator discretionary power to construe uncertain terms or to make eligibility determinations." *King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994, 998-99 (8th Cir. 2005) (en banc) (citing *Firestone*, 489 U.S. at 111). The parties agree that the benefit plan in the instant case gives Liberty Life such discretion. Accordingly, the Court must defer to the determination made by the administrator or fiduciary unless such determination is arbitrary and capricious. *Firestone*, 489 U.S. at 115. "[R]eview for an 'abuse of discretion' or for being 'arbitrary and capricious' is a distinction without a difference" because the terms are generally interchangeable. *Jackson v. Prudential Ins. Co. of Am.*, 530 F.3d 696, 701 n.6 (8th Cir. 2008), citing *Schatz v. Mutual of Omaha Ins. Co.*, 220 F.3d 944, 946 n.4 (8th Cir. 2000).

This standard of review, "though deferential, is not tantamount to rubber-stamping the result." *Torres v. Unum Life Ins. Co. of Am.*, 405 F.3d 670, 680 (8th Cir. 2005). Indeed, the decision of a plan administrator may be overturned if it is not "reasonable, i.e., supported by substantial evidence." *Donaho v. FMC Corp.*, 74 F.3d 894, 899 (8th Cir. 1996), *abrogated on other grounds by Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003). An administrator's decision will be deemed reasonable if "a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision." *Id.* (emphasis added). If a decision is supported by a reasonable explanation, it should not be disturbed, even though a different reasonable interpretation could have been made.

*Cash v. Wal-Mart Group Health Plan*, 107 F.3d 637, 641 (8th Cir. 1997), citing *Donaho*, 74 F.3d at 899.

There are five factors the Court will consider to determine whether Liberty Life's decision was reasonable:

(1) whether the administrator's interpretation is consistent with the goals of the Plan;

(2) whether the interpretation renders any language in the Plan meaningless or internally inconsistent;

(3) whether the administrator's interpretation conflicts with the substantive or procedural requirements of the ERISA statute;

(4) whether the administrator interpreted the relevant terms consistently; and

(5) whether the interpretation is contrary to the clear language of the Plan.

*Torres*, 405 F.3d at 680 (citing *Shelton v. ContiGroup Cos.*, Inc., 285 F.3d 640, 643 (8th Cir. 2002)).

Lastly, where—as is the case here—the benefit plan administrator is the same party that pays the claims for benefits, the Court will consider the conflict of interest arising from such an arrangement. *See Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 112-19 (2008). The importance of this factor will vary depending on whether circumstances suggest a high or low likelihood that the conflict of interest affected the benefits decision. *Id.* at 117. For example, where an administrator has a history of biased claims administration, the factor may be more significant. *Id.* But where an administrator has taken "active steps to reduce bias and to promote accuracy," the factor may be less significant. *Id.*

### III. DISCUSSION

As an initial matter, there is an apparent disagreement among the medical experts in this case. Dr. Knox, who performed the surgery on Ms. Mackey's knee, stated on August 20, 2013, that he considered Ms. Mackey disabled "from her occupation as a registered nurse." (Doc. 12-3, p. 107). This was so, at least in part, because of how her dependence on prescription narcotics would impair her legal and ethical decisions. (Doc 12-3, pp. 105-106). While these statements suggest that Dr. Knox considered Ms. Mackey to be disabled only from her former occupation, when prompted by Liberty Life with the general question of whether she was capable of performing sedentary, light, medium, heavy, or very heavy work, Dr. Knox did not select any of the corresponding boxes. This suggests instead that Dr. Knox considered Ms. Mackey to be disabled from performing any occupation whatsoever.[1]

Assuming that Dr. Knox intended to reach this latter conclusion, the three doctors whom Liberty Life hired to review Ms. Mackey's file disagreed. Dr. Vincent Boswell concluded that:

> Ms. Mackey can lift and carry 10 pounds occasionally. Ms. Mackey possesses the limitations of no squatting, no crouching, no climbing, no kneeling, and no crawling. Ms. Mackey has the restriction of standing and walking for 20 minutes per hour in an eight-hour workday. Ms. Mackey can sit for 15 minutes per hour in an eight-hour work day. Ms. Mackey can drive without restrictions. Ms. Mackey can push 25 pounds and pull 15

---

[1] Liberty Life's ERISA Brief (Doc. 14) states that on "September 6, 2012 Dr. Knox completed a form in which he stated that Mackey was able to lift up to 10 pounds occasionally, sitting over 50% of the time, and standing/walking occasionally." (Doc. 14, p. 4). However, a review of the document cited by Liberty Life to support this assertion reveals that it is plainly erroneous. In fact, Dr. Knox wrote the *complete opposite*, marking that he *disagrees* with the assertion that Ms. Mackey could perform such work. (Doc 12-3, p. 141). Given the potential importance of such a claim, the Court is somewhat alarmed at this misstatement, and admonishes counsel for Liberty Life to be more careful in the future.

> pounds. There are no restrictions on keying, filing, and fingering. There is no restriction for reaching at waist level and above shoulder level. I do not recommend reaching below waist level.

These restrictions are apparently consistent with Liberty's Life's definition of "sedentary" work,[2] but not of "light" work.[3] *See* Doc. 12-3, p. 105.

Dr. Robert Pennington reviewed Ms. Mackey's records and concluded that her quadriceps dysfunction results in "impairment of ability to squat, kneel, stand, and walking." (Doc. 12-3, p. 160). "Given the reported job duties of the claimant as an operating room nurse, the impairment would translate into restrictions and limitations of her ability to perform usual and expected duties which would include prolonged standing, walking, kneeling, and squatting." *Id.* Finally, Dr. Anthony Johnson concluded that:

> The claimant's impairments are her ability to squat, kneel, crouch, climb, crawl, stand, and walk. These impairments translate to the following restrictions and limitations: no squatting, kneeling, crouching, climbing, or crawling as well as no standing or walking greater than 2 hours without a 10-minute break. In addition, she should only occasionally lift and carry objects which weigh no more than 10 pounds. She can push up to 25 pounds and pull up to 15 pounds. She should not reach below her waist. The expected duration for these restrictions is permanent.

Both of these conclusions—like Dr. Boswell's—are consistent with an ability to perform "sedentary" work.

---

[2] Liberty Life defines "sedentary" work as lifting or carrying up to 10 pounds occasionally, sitting over 50% of the time, and standing or walking occasionally. Dr. Boswell states that Ms. Mackey was limited to sitting for 15 minutes per hour, less than 50% of the time. However, the Court believes that the logical inference from Dr. Boswell's conclusion is that Ms. Mackey is limited to sitting for 15 minutes *consecutively*, not 15 minutes total per hour.

[3] Liberty Life defines "light" work as lifting or carrying up to 20 pounds occasionally, sitting at least occasionally, and standing or walking frequently.

The Court believes that Liberty Life was within its discretion to conclude that Ms. Mackey's impairments do not generally prevent her from performing sedentary work, as Drs. Boswell, Pennington, and Johnson all reached that conclusion. Dr. Knox's opinion on the matter, moreover, was somewhat ambiguous. Even if it weren't, Liberty Life was not required to defer to his opinion as the treating physician. *Nord*, 538 U.S. at 822. And, with all three reviewing doctors reaching essentially the same conclusion, the Court cannot say that this conclusion was unreasonable, and not supported by substantial evidence.

This, however, does not end the Court's inquiry. Liberty Life also relied on a "Transferable Skills Analysis / Vocational Review" performed by one of its Vocation Case Managers, Ellen Levine. (Doc 12-3, pp. 78-81). The report begins by listing Ms. Mackey's age and some general information about her monthly income and former job. It next summarizes the materials reviewed in preparation for the report. Moving to the substance of the report, it reviews Ms. Mackey's physical limitations as described by Drs. Johnson and Pennington, and summarizes her educational and professional background. This includes a note that Ms. Mackey does not own a computer, but does use her phone to send emails. Based on her work, education, training, and life experience, the report populates a list of 10 generic skills which it deems Ms. Mackey to possess.[4] Turning to its conclusion, the report combines Ms. Mackey's "training, education, [and] experience" with her "physical capacities for work" and concludes that she is capable of holding three occupations: Utilization Review; Triage Nurse, Physician

---

[4] For example, "awareness of others' reactions and understanding why they react as they do" is one such skill. "Adjust[ing] actions in relation to others' actions" is another. "Actively looking for ways to help people" is yet another.

Hospital; and Volunteer Coordinator, Hospital. *Id.* at 80. Finally, the report states that Ms. Mackey can perform the above-listed occupations "[w]ith a reasonable degree of vocational certainty," and that Ms. Levine did not meet with Ms. Mackey in preparation for the report. *Id.*

In advance of Liberty Life's review of her claim, Ms. Mackey commissioned her own "Vocational Analysis," performed by Tanya Owen, Ph.D. (Doc. 12-3, pp. 54-61). This analysis was significantly more detailed than the one performed by Liberty Life. It examined, for example, limitations on Ms. Mackey's ability to perform daily activities, her dependence on hydrocodone to manage her pain, and her limited computer knowledge. Based on these factors and more, the report identified three "Sedentary" occupations matching Ms. Mackey's transferable skills. Namely, "Cardiac Monitor Technician," "Optometric Assistant," and "Medical case manager." *Id.* at 59. However, the report concluded that Ms. Mackey's dependence on hydrocodone precluded her from employment in any of the identified occupations, including those identified by Liberty Life. In each occupation:

> Ms. Mackey will be required to utilize her skills as a RN and will need an active license in the state of Arkansas. As such, her professional behavior will be governed by the Arkansas State Board of Nursing. On May 5, 2014, I contacted the Arkansas State Board of Nursing and spoke with Deborah Jones. Ms. Jones indicated that a registered nurse in the state of Arkansas is allowed to take medication for pain if they are not at work. However, they cannot work in any capacity that utilizes a RN license, if they take medication that is considered to be a controlled substance during their working hours. This applies to not only direct patient care but also to RN-related occupations including utilizations review, case management, or cardiac monitor.

*Id.* at 60. Given Ms. Mackey's dependence on hydrocodone, a controlled substance, Ms. Owen's report charged that Liberty Life's denial of LTD benefits was erroneous.

9

> There appears to be a failure to consider the licensing board's position about nurses working under the influence of a controlled substance. The statement issued by Dr. Johnson in 2013 that there was no medical evidence to support the side effects of medication becomes inconsequential to Ms. Mackey's determination of disability, as the Arkansas State Board considers only if medication considered to be a controlled substance is <u>consumed</u>, not what the side effects of such medications are.

*Id.* (emphasis in original). Relying on a 2014 report from Dr. Knox, Ms. Owen also expressed her opinion that Ms. Mackey would be incapable of returning to "competitive level work at any strength level," even for non-RN occupations. *Id.* at 60.

These conflicting vocational reports reveal three ways in which Liberty Life abused its discretion in denying Ms. Mackey's claim.

### A. The Nursing Board's Interpretation on Narcotics

In discussing the effects of Ms. Mackey's narcotics dependence on her employability, Liberty Life abused its discretion by failing to accept or investigate Ms. Owen's claim that mere use of narcotics prohibited Ms. Mackey from utilizing her RN license. The Nurse Practice Act of Arkansas provides that the Arkansas State Board of Nursing shall have the power to "[p]romulgate whatever regulations it deems necessary for the implementation of this chapter." Ark. Code. Ann. § 17-87-203(1)(A). Acting pursuant to this authority, the Board of Nursing established disciplinary proceedings for, amongst other infractions, "unprofessional conduct." *See* Arkansas State Board of Nursing Rules, Ch. 7, § IV; Doc. 12-3, pp. 47-48. Unprofessional conduct includes "[p]racticing nursing when unfit to perform procedures and make decisions in accordance with the license held because of physical, psychological, or mental impairment." *Id.*

According to Ms. Owen, she contacted an employee of the Nursing Board who interpreted this regulation as prohibiting nurses from taking controlled substances during working hours. Instead of adopting this interpretation, or contacting the Nursing Board to seek clarification of the interpretation, Liberty Life disregarded it entirely in favor of its own interpretation. *See* Doc. 12-2, pp. 6-7. It determined that Ms. Mackey would only be prohibited from utilizing her RN license if her narcotic usage created a secondary impairment, for which it further asserted there was no evidence.[5] *Id.*

By doing so, Liberty Life abused its discretion. The principle of judicial deference to an agency's interpretation of its own laws and regulations is deeply ingrained in the law. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984); *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945); *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). Given the respect accorded to agency interpretations by the nation's courts, it is inconceivable that a private actor would supplant the interpretation of an agency employee for its own, without additional inquiry. Liberty Life should have either accepted Ms. Owen's characterization of the Nursing Board employee's interpretation, or contacted the Nursing Board itself for clarification. Instead, it chose to do neither. Based on the Nursing Board employee's interpretation, Ms. Mackey's ability to perform the material and substantial duties of at least two of the three occupations identified in Liberty Life's vocational report is in serious doubt.[6] On remand, Liberty Life

---

[5] Liberty Life also asserted that there was "no evidence of the need for pain medication . . . ." This statement is plainly erroneous. Most obviously, the fact that pain medication was described by Ms. Mackey's primary care physician, Dr. Hagaman, is itself evidence that Ms. Mackey needed such medication.

[6] It is undisputed that two of the three identified occupations require an RN license: Utilization Review and Triage Nurse. Although this still leaves the occupation of Hospital

11

must either obtain proof of a different interpretation from the Nursing Board, or defer to the Board employee's interpretation of the regulation.

### B. Liberty Life's Failure to Consider Ms. Mackey's Age

The Court next finds that Liberty Life abused its discretion by not considering Ms. Mackey's age in evaluating her ability to perform the occupations its vocational report identified. Age is an explicit factor that Liberty Life is required to consider per the terms of the benefit plan. "'Any Occupation' means any occupation that the Covered Person is or becomes reasonably fitted by training, education, experience, *age*, physical and mental capacity." (Doc. 12-1, p. 5) (emphasis added). Liberty Life's vocational report, however, did not factor in Ms. Mackey's age when it concluded which occupations she could be suited to perform.[7] Rather, that report reached its conclusion by considering only her "training, education, experience" and her "physical capabilities."[8] (Doc. 12-3, p. 80). Where a benefit plan does not require an administrator to consider age, and where the participant is relatively young, age may be an innocuous factor hardly necessary to reference. S*ee Hillery v. Metro. Life Ins. Co.*, 453 F.3d 1087, 1092 (8th Cir. 2006) ("[T]here is no Eighth Circuit or ERISA requirement that a plan administrator consider

---

Volunteer Coordinator—and perhaps one or more of the occupations identified by Ms. Owen—Liberty Life's abuse of discretion with respect to the narcotics issue is still material to the Court's ultimate determination that the case must be reversed and remanded. This is so because Ms. Mackey's age and lack of computer skill may disqualify her from performing the other identified occupations, rendering Ms. Mackey disabled under the terms of the benefit plan.

[7] The Court does not consider the fact that the report mentions Ms. Mackey's age once in its "Demographics" section to at all indicate that her age was considered as a factor in identifying the listed occupations.

[8] Nor did Liberty Life, in its July 17, 2014 letter, at all supplement the report's analysis by analyzing how Ms. Mackey's age might affect her ability to perform the identified occupations.

age, if not specifically required by the plan."); *see also Gerhardt v. Liberty Life Assur. Co. of Boston*, 736 F.3d 777, 783 (8th Cir. 2013) (finding that plan administrator adequately considered 52 year old's age by referring to her age in most of its reports and stating that it considered her age in its termination letter). However, Ms. Mackey was 63 years old at the time of her appeal, only a couple of years away from retirement age. Her age is, accordingly, a central factor in determining whether she is capable of performing an occupation—particularly one that she had never performed in her career before. *See Garrett v. Hartford Life & Acc. Ins. Co.*, 2007 WL 3374671 (E.D. Ark. Nov. 8, 2007) (remanding to the benefit plan administrator in part for its failure to consider 60 year-old man's age, and also for its failure to consider that the participant only held one occupation during his entire adult life); *Gerhardt v. Liberty Life Ass. Co. of Boston*, 2008 WL 2476692, at *16-*18 (E.D. Ark. June 17, 2008) (remanding based in part on administrator's failure to consider how participant's age affected her ability to perform occupations identified in vocational report).[9]

Liberty Life relied in large part on its vocational report in reaching its ultimate conclusion that Ms. Mackey was not entitled to LTD benefits. Given how that report failed to consider Ms. Mackey's age (and, moreover, that Liberty Life did not even mention Ms. Mackey's age in its final letter explaining its bases for terminating her benefits), Liberty Life's reliance on it was an abuse of discretion. On remand, Liberty

---

[9] To be clear, the Court does not understand the Eighth Circuit *Gerhardt* decision, 736 F.3d at 777, to overrule the district court's finding that the administrator failed to adequately consider the participant's age, 2008 WL 2476692. The Eighth Circuit's opinion was issued only after the district court remanded the case back to the plan administrator, the participant's claim was denied again, the decision was again appealed to the district court, the district court affirmed the administrator's decision, and the Eighth Circuit affirmed the district court.

13

Life must thoroughly consider how Ms. Mackey's age would affect her ability to become reasonably fitted to perform the material and substantial duties of the identified occupations.

### C. Liberty Life's Failure to Consider Ms. Mackey's Computer Skills

Similar to Ms. Mackey's age, sorely missing from Liberty Life's vocational report is any analysis of how Ms. Mackey's lack of computer skills affects her ability to perform the material and substantial duties of the identified occupations. The report admits that Ms. Mackey does not own a computer, but that she uses her phone to send email. (Doc. 12-3, p. 79). The vocational report commissioned by Ms. Mackey expands on her computer skills—or lack thereof. "Ms. Mackey has limited computer knowledge and does not regularly use a computer. When she left [BRMC], she spent approximately 60 minutes per day (10 minutes per patient, 6 patients per day) using electronic medical records systems. She reports that the transition to electronic records was 'ridiculously difficult' for her." (Doc. 12-3, p. 56).

The importance of possessing at least some base-line computer skills cannot be overstated in today's economy. This is particularly true for occupations which may be classified as sedentary. Many—and likely most—of these jobs involve sitting at a desk and operating a computer for much of the work day. For example, being a volunteer coordinator presumably requires, in at least some part, use of Microsoft Office, managing an electronic database of volunteers, crafting and sending mass emails, and perhaps managing social media pages.[10]

---

[10] Because Liberty Life declined to discuss the computer skills required by the occupations at all, however, the Court can do no more than speculate as to the exact requirements.

14

Yet, Ms. Mackey's undisputed lack of computer skills appears not to have factored into Liberty Life's calculus at all. It is not one of the "Transferable Skills" identified in Liberty Life's vocational report, nor is it mentioned at all in its July 17, 2014 letter announcing the reasoning behind its decision to terminate Ms. Mackey's benefits.[11] *See* Doc. 12-3, pp. 79-80; Doc. 12-2. Given this omission, the Court finds that Liberty Life "should not have relied exclusively on [the vocational] report to find that [Ms. Mackey] had the capacity to work certain sedentary . . . jobs . . . prior to considering whether [she] possessed any computer skills . . . ." *Gully v. Aetna Life Ins. Co.* 997 F. Supp. 2d 955, 962 (W.D. Ark. 2014). On remand, Liberty Life must consider Ms. Mackey's lack of computer skills in light of the technological requirements of the identified occupations, whatever those requirements may be.

_____

Absent consideration of Ms. Mackey's age and lack of computer skills, Liberty Life's vocational analysis was little more than a formulaic document, insufficiently individualized to Ms. Mackey. It identified two basic inputs ("Transferable Skills" and Ms. Mackey's physical limitations), and created an output (three occupations). This output was then afforded controlling weight by Liberty Life in terminating Ms. Mackey's benefits. Indeed, in its July 17, 2014 letter explaining its bases for terminating Ms. Mackey's benefits, Liberty Life referred to this analysis in dispositive terms. *See* Doc.

---

[11] The July 17, 2014 letter, moreover, describes the vocational report's methodology as having compared the identified "Transferable Skills" against Ms. Mackey's limitations to populate the list of acceptable occupations. *See* Doc. 12-2, pp. 5-6. This supports the Court's finding that neither the vocational report nor Liberty Life's ultimate decision factored Ms. Mackey's lack of computer skills. It suggests that both factored only the generic list of skills Ms. Mackey reportedly had, and declined to consider material skills that she didn't have.

12-2, p. 6 ("These [Transferable Skills] would allow [Ms. Mackey] to perform the following, but not limited to, vocational alternatives: [listing three occupations]. These occupations are within her functional capacity. *Therefore, her claim was closed.*" (emphasis added)).

While not without value, such an analysis lacks the sort of individualized consideration necessary to determine whether the actual member, and not just a generic person with their educational and occupational background and physical limitations, can perform the material and substantial duties of an occupation. This type of formulaic vocational analysis can serve as important evidence for determining whether a plan member is suited to an occupation, *see Green v. Union Sec. Ins. Co.*, 646 F.3d 1042, 1052 (8th Cir. 2011), but a benefit plan administrator must also consider its member as an individual, factoring the material characteristics of the person, such as (in this case) age and computer skill.

## IV. CONCLUSION

The Eighth Circuit has instructed its district courts to consider five factors to determine whether a benefit plan administrator's decision to terminate benefits was unreasonable. *See Torres*, 405 F.3d at 680. Based on the issues identified herein, the Court finds that several of the factors are satisfied. Most notably, Liberty Life's failure to consider Ms. Mackey's age renders that term in the plan meaningless, as it is explicitly listed as a factor in determining whether a member can perform "Any Occupation." (Doc. 12-1, p. 5). This also makes Liberty Life's interpretation of "Any Occupation" contrary to the clear language of the plan. Similarly, by failing to consider Ms. Mackey's lack of computer skills, Liberty Life rendered the important phrase "material and

substantial duties" at least partially meaningless. Given the centrality of computer usage to most sedentary occupations in the national economy, some analysis of the extent of computer skill required, and whether the member possesses—or can achieve—that level of skill, is necessary to give that phrase real meaning.[12] This is at least true where there is substantial evidence in the record that the plan participant lacks computer skills, as is the case here. *See generally Gully*, 997 F. Supp. 2d at 955 (discussing how an administrator's reliance on a report flawed due in part to its failure to consider computer skills met the five factors identified by the Eighth Circuit).

Accordingly, for the reasons stated herein, the Court finds that Liberty Life abused its discretion in denying Ms. Mackey's claim. The Court additionally finds that the proper remedy in this case is to **REVERSE** Liberty Life's decision and **REMAND** Ms. Mackey's claim back to it for further evaluation correcting the issues identified by the Court herein. *See King*, 414 F.3d at 1005.

**IT IS SO ORDERED** on this $\underline{7^{th}}$ day of March, 2016.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE

---

[12] Relatedly, Liberty Life's failure to consider Ms. Mackey's lack of computer skills likely renders its interpretation "contrary to the clear language of the Plan" because it discounts a plausible material and substantial duty of the identified occupations.